IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

BRADFORD APPLEGATE,

                           Plaintiff,

          v.                                        Civil Action No.
                                                    9:02-CV-0276 (LEK/DEP)


ANTHONY J. ANNUCCI, *et al.,*

                           Defendants.

_____

APPEARANCES:                        OF COUNSEL:

FOR PLAINTIFF:

BRADFORD APPLEGATE, *Pro Se*


FOR DEFENDANTS:

HON. ANDREW M. CUOMO                MEGAN M. BROWN, ESQ.
Office of the Attorney General      Assistant Attorney General
State of New York
The Capitol
Albany, New York 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

          Plaintiff Bradford Applegate, a New York State prison inmate who is

proceeding *pro se* and *in forma pauperis*, has commenced this civil rights

action pursuant to 42 U.S.C. § 1983 against the Deputy Commissioner and General Counsel of the New York State Department of Correctional Services ("DOCS") and several other DOCS employees, complaining of diverse constitutional violations alleged to have occurred during the time of his confinement.  In his complaint, Applegate asserts claims stemming from various events at three separate correctional facilities alleging *inter alia,* the use of excessive force, acts of retaliation, deprivation of procedural due process, and interference with communications relating to legal matters, and seeks recovery of compensatory and punitive damages.

Certain of plaintiff's claims were previously dismissed by the court for failure to state a claim upon which relief may be granted.  Now that issue has been joined and pretrial discovery has concluded, the defendants remaining in the action have moved for summary judgment requesting dismissal of the balance of plaintiff's claims, both procedurally based upon his failure to properly exhaust available administrative remedies with regard to a majority of his causes of action, and on the merits.  For the reasons set forth below I recommend that the motion, which plaintiff has not opposed, be granted and that Applegate's

remaining claims be dismissed.

I.      BACKGROUND

At the times relevant to his complaint, plaintiff was a New York State prison inmate entrusted into the custody of the DOCS.  *See* Generally Complaint (Dkt. No. 1).  Beginning in or around May of 1998, plaintiff was assigned to the Greenhaven Correctional Facility ("Greenhaven").  *Id.* ¶¶ 22-23.  Plaintiff was later transferred into the Upstate Correctional Facility ("Upstate") in July of 1999, where he remained until December, 1999 when he was reassigned to the Elmira Correctional Facility ("Elmira").[1]  *Id.* ¶¶ 56, 74.

Plaintiff's complaint in this action chronicles several instances of alleged harassment and retaliatory conduct on the part of prison officials; many of the incidents of which he now complains are attributed by the plaintiff to retaliatory motivation based upon his commencement and prosecution of another civil rights action in this district, *Applegate v. Mann, et al.,* Civil Action No. 98-CV-0067 (N.D.N.Y., filed in 1998) ("*Applegate*

---

[1]      Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined, generally though not always for disciplinary reasons, for twenty-three hours each day.  *See Samuels v. Selsky*, No. 01 CIV. 8235, 2002 WL 31040370, at *4 n.11 (S.D.N.Y. Sept. 12, 2002).

*I*"). Complaint (Dkt. No. 1) ¶ 3. The first incident of which the plaintiff

complains occurred shortly after his transfer into Greenhaven, when his

typewriter was destroyed and "the vast majority" of his legal papers were

taken from him. Complaint (Dkt. No. 1) ¶ 23. With this exception,

however, plaintiff's existence at Greenhaven was apparently fairly

uneventful until September 11, 1998, when he amended his complaint in

*Applegate I* to challenge an earlier special housing unit ("SHU")

disciplinary confinement – an action which, he maintains, led defendant S.

Carlson, a corrections officer at Greenhaven, to initiate a "campaign of

relentless harassment" against him, including "constant pat-frisks[.]" *Id.* ¶

26. Plaintiff asserts that defendant Carlson's regimen of harassment also

included the issuance of a false misbehavior report on January 25, 1999,

accusing him of smuggling and stealing toilet paper.[2] *Id.* ¶ 27.

After sending a letter on February 21, 1999 to Greenhaven

Superintendent C. Artuz complaining of Corrections Officer Carlson's

conduct, the harassment experienced by the plaintiff escalated.

Complaint (Dkt. No. 1) ¶¶ 30-38. Plaintiff was pat-frisked on March 4,

---

[2]      Plaintiff's claims relating to the allegedly false misbehavior report were
previously dismissed by the court. *See* Report and Recommendation dated
September 21, 2005 (Dkt. No. 38) at pp. 16-19, affirmed as modified by decision and
order issued by District Judge Lawrence E. Kahn on February 6, 2006 (Dkt. No. 40).

1999 by defendant Carlson as part of a routine security measure implemented for inmates returning to their cell blocks from their workstations in order to detect weapons and other materials attempted to be smuggled out of the area.  Carlson Aff. (Dkt. No. 52-13) ¶¶ 14-25; Complaint (Dkt. No. 1) ¶¶ 36-37.  Plaintiff asserts that during the course of that pat-frisk defendant Carlson "savagely grabbed [him] by the back of his shirt and attempted to slam his face into the wall."  Complaint (Dkt. No. 1) ¶¶ 36-37.  Defendant Carlson vociferously denies that allegation, countering that during the course of the March 4, 1999 pat-frisk Applegate engaged in provocative behavior, taking his hands off of the wall where he had been instructed to place them, and turning toward the left prior to conclusion of the pat-frisk, necessitating that Carlson take appropriate counter-measures to ensure the safety and security of corrections officers and other inmates present in the area at the time.  Carlson Aff. (Dkt. No. 52-13) ¶¶ 14-23.  Defendant Carlson denies having used unnecessary force during the encounter, and specifically denies attempting to push Applegate's face in the wall or otherwise cause him harm.  *Id.* ¶ 19. Plaintiff was not injured as a result of the incident.  Brown Aff. (Dkt. No. 52-4), Exh. A at 55.

Following the incident plaintiff was issued a misbehavior report alleging that he had engaged in violent conduct (Disciplinary Rule 104.11), violated a direct order (Disciplinary Rule 106.10), engaged in physical interference with a corrections officer (Disciplinary Rule 107.10), and violated prison policies related to searches and frisks (Disciplinary Rule 115.10). Complaint (Dkt. No. 1) ¶ 40; Carlson Aff. (Dkt. No. 52-13) ¶ 27. Following a Tier II hearing conducted by defendant G. Schneider beginning on March 7, 1999, plaintiff was found guilty of all charges set forth in the misbehavior report, and sentenced to a period of thirty days of keeplock confinement.[3,4] Complaint (Dkt. No. 1) ¶ 45. That determination

---

[3]     The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace*, 143 F.3d 653, 655 (2d Cir.), *cert. denied*, 525 U.S. 907, 119 S. Ct. 246 (1998).

[4]     Keeplock is a form of confinement restricting an inmate to his or her cell, separating the inmate from others, and depriving him or her of participation in normal prison activities. *Gittens v. LeFevre*, 891 F.2d 38, 39 (2d Cir. 1989) (citing 7 N.Y.C.R.R. § 251-1.6); *Warburton v. Goord*, 14 F. Supp. 2d 289, 293 (W.D.N.Y. 1998) (citing *Gittens*); *Tinsley v. Greene*, No. 95-CV-1765, 1997 WL 160124, at *2 n. 2 (N.D.N.Y. Mar. 31, 1997) (Pooler, D.J. & Homer, M.J.) (citing, *inter alia*, *Green v. Bauvi*, 46 F.3d 189, 192 (2d Cir. 1995)). Inmate conditions while keeplocked are substantially the same as in the general population. *Lee v. Coughlin*, 26 F. Supp. 2d 615, 628 (S.D.N.Y. 1998). An inmate is confined to his or her general population cell for twenty-three hours a day, with one hour for exercise. *Id.* Inmates can leave their cells for showers, visits, medical exams and counseling. *Id.* Inmates can have cell study, books and periodicals. *Id.* The main difference between keeplock and the

was affirmed on appeal to First Deputy Superintendent Dennis Bliden on

March 18, 1999.  Complaint (Dkt. No. 1) ¶ 48.

In or about April of 1999, following an altercation involving several

inmates at Greenhaven, plaintiff was charged with participating in the fight

and with possession of a weapon based upon the discovery of a

sharpened can-top which, he contends, "was planted on his person by

prison guards[.]"  Complaint (Dkt. No. 1) ¶ 54.  Although plaintiff's

complaint provides no specifics regarding any ensuing disciplinary

proceedings, he was apparently found guilty, following a hearing, of

multiple infractions and sentenced to a period of seventy-five days of

keeplock confinement for fighting, and an additional six months of SHU

confinement based upon the weapon possession charge.  *Id.* ¶ 55.

In mid-July of 1999, plaintiff was transferred to Upstate and placed

in that facility's SHU.  Plaintiff maintains that while there he was deprived

of law library materials for a period of over three months, and during that

time was hampered in his ability to pursue a state court application to

vacate his state court judgment of conviction and to pursue discovery in

*Applegate I*.  Complaint (Dkt. No. 1) ¶¶ 57-71.

---

general population is that keeplocked inmates do not leave their cell for out-of-cell
programs, and are usually allowed less time out of their cells on the weekends.  *Id.*

In or about December of 1999, after serving his full keeplock and

SHU sentences at Upstate, plaintiff was transferred into Elmira.  *Id.* ¶ 74.

There, following a fight in March of 2000 involving the plaintiff, a search of

his cell revealed an unworked length of metal, claimed by him to have

been planted in his locker by staff members.  *Id.* ¶ 75.  Plaintiff attributes

the incident to his "repeated attempts" to amend or supplement his

complaint in *Applegate I*.  *Id.*  Although once again plaintiff's complaint is

lacking in specifics in this regard, disciplinary charges were apparently

lodged against him as a result of the incident, leading to the imposition of

thirty days of keeplock confinement for fighting and 150 days of SHU

confinement for possession of a weapon.  *Id.* ¶ 76.

II.   PROCEDURAL HISTORY

Plaintiff commenced this action on February 26, 2002.[5]  Dkt. No. 1.

---

[5]       Plaintiff's complaint was initially dismissed by the court based upon his
failure to comply with a directive that he file an amended complaint eliminating the
excessive and unnecessary details set forth in the original pleading.  *See* Dkt. No. 10.
The judgment entered dismissing plaintiff's complaint on this ground was later
reversed on appeal to the United States Court of Appeals for the Second Circuit, and
the matter was remanded to this court for further appropriate proceedings.  Dkt. No.
13.  In its summary order, which was subsequently issued as a mandate on July 9,
2004, the Second Circuit noted that on remand the district court would be authorized
by Rule 12(f) of the Federal Rules of Civil Procedure to strike any portions of the
complaint deemed to be redundant or immaterial, citing *Salahuddin v. Cuomo*, 861
F.2d 40, 42-43 (2d Cir. 1988).  Dkt. No. 13.  In their earlier dismissal motion, however,
defendants chose not to avail themselves of this mechanism for eliminating portions of
plaintiff's complaint, which extends over twenty-eight typewritten pages and contains

Named as defendants in plaintiff's complaint are Anthony J. Annucci,

Esq., the DOCS Deputy Commissioner and General Counsel;  Corrections

Officer S. Carlson, Deputy Superintendent of Security Schneider,

Corrections Lieutenant G. Schneider, and Corrections Lieutenant A. Pelc,

all of whom were employed at the relevant times at Greenhaven; Deputy

Superintendent of Programs R. Santor, Superintendent T. Ricks, and

Corrections Officer Gardner, all of whom worked at Upstate during the

relevant times; and Superintendent F.G. Bennett, Jr. and Deputy

Superintendent of Administrative Services William J. Hopkins, both

assigned to Elmira.

Following service of the summons and complaint and reinstatement

of the action by the Second Circuit, defendants moved on February 28,

2005 seeking dismissal on a variety of grounds including, *inter alia,* the

applicable statute of limitations, lack of personal involvement, and the

general failure of plaintiff's complaint to set forth a claim upon which relief

may be granted.[6]  Dkt. No. 35.   That motion, which was not opposed, led

_____

102 paragraphs.

[6]     In their pre-answer motion, defendants also asserted entitlement to
qualified immunity – an argument which was not directed toward any particular cause
of action.

to the issuance on September 21, 2005 of a report in which I recommended dismissal of certain of plaintiff's claims on various grounds. Dkt. No. 38.  The report was adopted, with slight modification, by Senior District Judge Lawrence E. Kahn in a decision and order issued on February 2, 2006.  Dkt. No. 40.  As a result of the issuance of my report and Judge Kahn's order, the claims which remain in the action include causes of action for retaliation, a portion of plaintiff's original claim related to denial of access to the courts, a procedural due process cause of action stemming from disciplinary proceedings at Elmira, and an excessive force claim.  The defendants remaining in the action following the issuance of that decision include defendants Annucci, S. Carlson, Deputy Superintendent of Security G. Schneider, and Corrections Officers A. Pelc, Gardner and F.G. Bennett, Jr.[7,8]

Now that pretrial discovery, which included the taking of plaintiff's

---

[7]     As will be seen, Lieutenant G. Schneider and Corrections Officer Gardner, though named as defendants, have never been served in the action and are thus not presently before the court.  *See* pp. 11-16, *post.*

[8]     While my initial report recommended dismissal of plaintiff's claims against defendant R. Santor, based upon lack of personal involvement, and that portion of my report appears to have been adopted by Senior District Judge Lawrence E. Kahn, the docket sheet was not modified to reflect this fact.  The clerk's office is hereby directed to amend its records to reflect that all of plaintiff's claims against defendant R. Santor have been dismissed by the court.

deposition, has been completed the remaining defendants having appeared in the action have moved for the entry of summary judgment dismissing plaintiff's remaining claims.  Dkt. No. 52.  In their motion, defendants assert that with the exception of plaintiff's denial of court access claim, each of plaintiff's causes of action is procedurally barred based upon his failure to exhaust available administrative remedies before commencing suit.  *Id.*  Defendants also contend that plaintiff's remaining claims are lacking in merit, as a matter of law, additionally asserting a lack of personal involvement on the part of defendant F.G. Bennett, Jr., the Superintendent at Elmira, in the constitutional deprivations alleged, and renew their claim of entitlement to qualified immunity.  *Id.*  Defendants' motion, which plaintiff has not opposed, is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).[9]  *See also* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

    A.    Dismissal Of Unserved Defendants

---

[9]        The motion papers served upon the plaintiff and filed with the court include the requisite notice pursuant to Northern District of New York Local Rule 56.2, apprising him of the potential consequences of his failure to oppose defendants' motion.  *See* Dkt. No. 52-2.

Following the return of this matter to this court from the Second Circuit, summonses were issued by the clerk on September 2, 2004 and forwarded for service to the United States Marshals Service.[10]  *See* Dkt. No. 14.   On November 19, 2004 the summonses were returned as unexecuted with regard to certain of the defendants, including Corrections Officers Sean Carlson, Ralph Santor, William Hopkins, Arlon Pelc and Gardner.  Dkt. No. 17.  Accompanying that return was a letter advising that the DOCS was unable to identify the employee designated by the plaintiff only by the last name of Gardner, noting that there are several DOCS workers with that last name.[11]  *Id.*  The docket sheet discloses neither a return of an acknowledgment of service by the other remaining unserved defendant, Lieutenant G. Schneider, nor a return of service reflecting the failure to serve that individual.  Defendants now seek dismissal of plaintiff's claims with regard to both of the two unserved defendants, including Lieutenant G. Schneider and Corrections Officer Gardner.

---

[10]     According to the court's records, those summonses were later reissued on October 28, 2004.

[11]     According to that letter the summonses were re-sent to defendants Santor, Hopkins, Carlson and Pelc, and those four defendants have since appeared in the action.

Defendant's request is bottomed upon the requirement, imposed by

Rule 4(m) of the Federal Rules of Civil Procedure, that service be made

within 120 days of issuance of the summons, absent a court order

extending that period.[12]  "[W]here good cause is shown, the court has no

choice but to extend the time for service, and the inquiry is ended."

*Panaras v. Liquid Carbonic Indus. Corp.*, 94 F.3d 338, 340 (7th Cir. 1996).

"If, however, good cause does not exist, the court may, in its discretion,

either dismiss the action without prejudice or direct that service be

effected within a specified time."  *Id.* (citing Fed. R. Civ. P. 4(m)); *Zapata*

*v. City of New York*, 502 F.3d 192, 196 (2d Cir. 2007) ("[D]istrict courts

have discretion to grant extensions even in the absence of good cause.");

*Romandette v. Weetabix Co., Inc.*, 807 F.2d 309, 311 (2d Cir. 1986).

When examining whether to extend the prescribed period for service, a

---

[12]   That rule provides that

> [i]f a defendant is not served within 120 days after the
> complaint is filed, the court – on motion or on its own after
> notice to the plaintiff – must dismiss the action without
> prejudice against that defendant or order that service be
> made within a specified time.  But if the plaintiff shows good
> cause for the failure, the court must extend the time for
> service for an appropriate period. . . .

Fed. R. Civ. P. 4(m). This court's local rules shorten the time for service from the 120
day period under Rule 4(m) to sixty days.  *See* N.D.N.Y.L.R. 4.1(b).

district court is afforded ample discretion to weigh the "overlapping

equitable considerations" involved in determining whether good cause

exists and whether an extension may be granted in the absence of good

cause.  *See Zapata*, 502 F.3d at 197.

      A plaintiff's *pro se* status entitles him or her to a certain degree of

leniency insofar as service of process is concerned; courts generally favor

resolution of a case on its merits rather than on the basis of a procedural

technicality.  *Poulakis v. Amtrak*, 139 F.R.D. 107, 109 (N.D. Ill. 1991).

When a plaintiff proceeds *in forma pauperis*, such as is the case in this

instance, the court is obligated to issue the plaintiff's process to the United

States Marshal, who must in turn effect service upon the defendants,

thereby relieving the plaintiff of the burden to serve process once

reasonable steps have been taken to identify for the court the defendants

named in the complaint.  *Byrd v. Stone*, 94 F.3d 217, 219 (6th Cir. 1996).

That does not mean, however, that a *pro se* plaintiff may stand idly by

upon being notified that efforts by the U.S. Marshals Service to serve a

particular defendant have been unsuccessful.  *VanDiver v. Martin*, 304 F.

Supp. 2d 934, 938-43 (E.D. Mich. 2004).  In such instances it is

incumbent upon the plaintiff to develop, though pretrial discovery or

14

otherwise, any additional information necessary to permit service by the United States Marshals Service.  *See VanDiver*, 304 F. Supp. 2d at 942.

In this case defendant Gardner has not been served or otherwise appeared in the action within the appropriate time period.  Based upon a review of the record I am unable to find good cause justifying plaintiff's failure to effectuate timely service, and find no sufficient basis presented to exercise discretion in favor of extending the governing period of service. Accordingly, since this court has never acquired jurisdiction over him, I recommend dismissal of the complaint as against defendant Gardner, without prejudice.  *See, e.g., Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 709 F. Supp. 1279, 1282 (S.D.N.Y. 1989) (citing *Mississippi Publishing Corp. v. Murphree*, 326 U.S. 438, 444-45, 66 S. Ct. 242, 245-46 (1946)) (court lacks jurisdiction until defendants properly served with summons and complaint).

The situation is distinctly different with regard to Lieutenant G. Schneider.  The fact that two individuals, apparently husband and wife, named G. Schneider are listed as defendants in this case has engendered considerable confusion on all levels.  While it appears that Deputy Superintendent of Security G. Schneider has been served, Lieutenant G.

Schneider has not, although the summons issued to that individual was not returned as unexecuted.  It also appears that letters received by the court from the defendants' counsel requesting extensions of time to answer have furthered that confusion, not clearly referencing which G. Schneider is among the persons on whose behalf the requests have been made.  *See* Dkt. Nos. 28, 33.  And, while defendants' notice of motion in support of their earlier dismissal motion refers to the defendant as "George Schneider" without indicating whether it is Deputy Superintendent of Security G. Schneider or Lieutenant G. Schneider, as defendants' counsel herself acknowledges both G. Schneiders were referenced in her objections filed to the report and recommendation issued in the case.  *See* Dkt. No. 39.  Under these circumstances I recommend against dismissal of plaintiff's claims against defendant Lt. G. Schneider on the basis of failure to serve.[13]

      B.    <u>Significance Of Plaintiff's Failure To Properly Oppose Defendants' Motion</u>

---

[13]    The fact that the two defendants named G. Schneider appear to be related and work at the same DOCS facility is strongly suggestive of awareness on the part of a Lieutenant G. Schneider of the pendency of this action and the assertion of claims against him or her.  While not intended to minimize the importance of obtaining personal jurisdiction over a named defendant, I am therefore satisfied that no significant due process concerns are presented by failing to dismiss this action against Lieutenant G. Schneider on this procedural ground.

Before turning to the merits of plaintiff's claims, a threshold issue to be addressed is the legal significance, if any, of his failure to oppose defendants' summary judgment motion, and specifically whether that omission automatically entitles defendants to dismissal of Applegate's complaint, based upon their motion.

This court's rules provide that

> [w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

N.D.N.Y.L.R. 7.1(b)(3).  While *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, *see Jemzura v. Public Serv. Comm'n*, 961 F. Supp. 406, 415 (N.D.N.Y. 1997) (McAvoy, C.J.)), the failure of such a plaintiff to oppose a summary judgment motion does not preclude the court from deciding the motion.  *Robinson v. Delgado*, No. 96-CV-169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J. & Hurd, M.J.); *Cotto v. Senkowski*, No. 95-CV-1733, 1997 WL 665551, at *1 (N.D.N.Y. Oct. 23, 1997) (Pooler, J. & Hurd, M.J.); *Wilmer v. Torian*, 980 F. Supp. 106, 106-07 (N.D.N.Y. 1997) (Pooler, J. &

Hurd, M.J.).  As can be seen by the face of Local Rule 7.1(b)(3), however,

before summary judgment can be granted under such circumstances the

court must review the motion to determine whether it is facially

meritorious.  *See Allen v. Comprehensive Analytical Group, Inc*., 140 F.

Supp. 2d 229, 231-32 (N.D.N.Y. 2000) (Scullin, C.J.); *Leach v. Dufrain*,

103 F. Supp. 2d 542, 545-46 (N.D.N.Y. 2000) (Kahn, J.).

Although a plaintiff's failure to properly oppose a defendant's motion

does not assure that the motion, however lacking in merit, will be granted,

that failure is not without consequences.  By opting not to submit papers

in opposition to their motion, plaintiff has left the facts set forth in

defendants' Local Rule 7.1(a)(3) Statement unchallenged.  Courts in this

district have routinely invoked Local Rule 7.1(a)(3) and its predecessor,

Local Rule 7.1(f), deeming facts set forth in a statement of material facts

not in dispute to have been admitted based upon an opposing party's

failure to properly respond to that statement.[14]  *See*, *e.g.*, *Elgamil v.*

*Syracuse Univ.*, No. 99-CV-611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug.

22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York*

---

[14]     According to Local Rule 7.1(a)(3), "any facts set forth in the Statement of
Material Facts shall be deemed admitted unless specifically controverted by the
opposing party."  *See* N.D.N.Y.L.R. 7.1(a)(3).

*City Dep't of Corrs.*, 214 F.3d 275, 292 (2d Cir. 2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).  I recommend that when reviewing defendants' motion for facial sufficiency, the court follow this well-established practice and, notwithstanding plaintiff's *pro se* status, accept defendants' assertion of facts as set forth in their Local Rule 7.1(a)(3) Statement as uncontroverted, in light of plaintiff's failure to respond to that statement.

        C.      Summary Judgment Standard

        Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure.  Under that provision, summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004).  A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the

governing law." *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510; *see also*

*Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing

*Anderson*).  A material fact is genuinely in dispute "if the evidence is such

that a reasonable jury could return a verdict for the nonmoving party."

*Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.  Though *pro se* plaintiffs

are entitled to special latitude when defending against summary judgment

motions, they must establish more than mere "metaphysical doubt as to

the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986); *but see Vital v. Interfaith*

*Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court

to consider whether *pro se* plaintiff understood nature of summary

judgment process).

When summary judgment is sought, the moving party bears an initial

burden of demonstrating that there is no genuine dispute of material fact

to be decided with respect to any essential element of the claim in issue;

the failure to meet this burden warrants denial of the motion.  *Anderson*,

477 U.S. at 250 n.4, 106 S. Ct. at 2511 n.4; *Security Ins.*, 391 F.3d at 83.

In the event this initial burden is met, the opposing party must show,

through affidavits or otherwise, that there is a material issue of fact for

trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *Anderson*, 477 U.S. at 250, 106 S. Ct. at 2511.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party.  *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998).  Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor."  *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S. Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

D.    <u>Failure To Exhaust</u>

In their motion defendants assert that with the exception of his court access claims, which appear to have been the subject of more than one grievance filed over time, plaintiff's claims are procedurally barred based upon his failure to exhaust available, administrative remedies before commencing suit.  While acknowledging that some of plaintiff's claims, including claims of harassment, were the subject of letters allegedly

written by the plaintiff to prison officials, defendants assert that those letters do not act as a surrogate for the filing and pursuit to completion of a grievance.

With an eye toward "reduc[ing] the quantity and improv[ing] the quality of prisoner suits[,]"  *Porter v. Nussle*, 534 U.S. 516, 524, 122 S. Ct. 983, 988 (2002), Congress altered the inmate litigation landscape considerably through the enactment of the Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), imposing several restrictions on the ability of prisoners to maintain federal civil rights actions.  An integral feature of the PLRA is a revitalized exhaustion of remedies provision which requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 126 S. Ct. 2378, 2382 (2006); *Hargrove v. Riley,* No. CV-04-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007).  This limitation is intended to serve the dual purpose of affording "prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being

22

haled into courtl[,]" and to improve the quality of inmate suits filed through the production of a "useful administrative record."  *Jones v. Bock,* 549 U.S. 199, 127 S. Ct. 910, 914-15 (2007) (citations omitted); *see Woodford,* 548 U.S. at 91-92, 126 S.Ct. at 2386; *see also Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir. 2004).  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter*, 534 U.S. at 532, 122 S. Ct. at 992 (citation omitted).

The failure of a prisoner to satisfy the PLRA's exhaustion requirement is not jurisdictional, but instead gives rise to a defense which must affirmatively be raised by a defendant in response to an inmate suit. *Jones,* 127 S. Ct. at 918.  In the event a defendant named in such an action establishes that the inmate plaintiff failed properly to exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal.  *See Pettus v. McCoy*, No. 04-CV-0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford*, 126 S. Ct. at 2387-88 (holding that the PLRA requires "proper exhaustion" of available remedies).  "Proper exhaustion" requires a

23

plaintiff to procedurally exhaust his or her claims by "compl[ying] with the

system's critical procedural rules."  *Woodford*, 548 U.S. at 95, 126 S. Ct.

at 2388; *see also Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007) (citing

*Woodford*).  While placing prison officials on notice of a grievance through

less formal channels may constitute claim exhaustion "in a substantive

sense", an inmate plaintiff nonetheless must meet the procedural

requirement of exhausting his or her available administrative remedies

within the appropriate grievance construct in order to satisfy the PLRA.

*Macias*, 495 F.3d at 43 (quoting *Johnson*, 380 F.3d at 697-98) (emphasis

omitted).

In a series of decisions rendered since the enactment of the PLRA,

the Second Circuit has crafted a three-part test for determining whether

dismissal of an inmate plaintiff's complaint is warranted for failure to

satisfy the PLRA's exhaustion requirement.  *Macias*, 495 F.3d at 41; *see*

*Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir. 2004).  Under the

prescribed algorythm, a court must first determine whether administrative

remedies were available to the plaintiff at the relevant times.  *Macias,* 495

F.3d at 41; *Hemphill,* 380 F.3d at 686.  If such a remedy existed and was

available, the court must next examine whether the defendants have

24

forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it or whether, through their own actions, by preventing the exhaustion of plaintiff's remedies, they should be estopped from asserting failure to exhaust as a defense. *Macias*, 495 F.3d at 41; *Hemphill*, 380 F.3d at 686. In the event the proffered defense survives these first two levels of scrutiny, the court lastly must examine whether special circumstances nonetheless exist and "have been plausibly alleged" to justify the plaintiff's failure to comply with the applicable administrative procedural requirements.[15] *Macias*, 495 F.3d at 41; *Hemphill*, 380 F.3d at 686.

### 1.    Availability of Remedy

New York prison inmates are subject to an Inmate Grievance Program ("IGP") established by the Department of Correctional Services ("DOCS"), and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson*, No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004) (citing *Mojias v. Johnson*, 351 F.3d 606 (2d Cir. 2003) and *Snider v. Melindez*, 199 F.3d 108, 112-13 (2d Cir.1999)). The

---

[15]    In practicality these three prongs of the prescribed test, though intellectually distinct, plainly admit of significant overlap. *See Hargrove v. Riley,* No. CV-04-4587, 2007 WL 389003, at *8 n.14 (E.D.N.Y. Jan. 31, 2007); *see also Giano v. Goord*, 380 F.3d 670, 677 n.6 (2d Cir. 2004).

IGP consists of a three-step review process.  First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within twenty-one days of the incident.[16]  7 N.Y.C.R.R. § 701.5(a).  The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance.  *Id.* §§ 701.4(b), 701.5(b).  If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision.  *Id.* § 701.5(c).  The third level of the process affords the inmate the right to appeal the superintendent's ruling to the Central Office Review Committee ("CORC"), which makes the final administrative decision.  *Id.* § 701.5(d).  Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court.  *Reyes v. Punzal*, 206 F. Supp. 2d 431, 432 (W.D.N.Y. 2002) (citing, *inter alia*, *Sulton v. Greiner*, No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec. 11, 2000)).

Certain of plaintiff's claims implicate misconduct on the part of corrections officials.  In addition to the established IGP described above, the DOCS has implemented an expedited grievance process to address

---

[16]     The IGP supervisor may waive the grievance timeliness requirement due to "mitigating circumstances."  7 N.Y.C.R.R. § 701.6(g)(1)(i)(a)-(b).

complaints of alleged staff harassment.[17]  7 N.Y.C.R.R. § 701.8; *see*

*Perez v. Blott,* 195 F. Supp. 2d 539, 543 (S.D.N.Y. 2002) (describing

expedited grievance process under prior relevant regulation, 7 N.Y.C.R.R.

§ 701.11, which has since been re-codified).  This expedited process is

not exclusive, and does not preclude the filing of an ordinary grievance in

the event of perceived staff harassment or retaliation.  *See* Bellamy Decl.

(Dkt. No. 52-15) ¶¶ 13, 17; *see also* 7 N.Y.C.R.R. § 701.8(a).[18]  An inmate

claiming harassment by a DOCS worker must file a grievance, which is

then assigned a grievance number and, in the event of allegations of staff

harassment, forwarded to the superintendent of the facility.  7 N.Y.C.R.R.

§ 701.8(b).  If, after reviewing the grievance of the superintendent finds it

not to be facially meritorious, the matter reverts back to the inmate

grievance resolution committee ("IGRC") for review.  7 N.Y.C.R.R. §

701.8(c).  If, on the other hand, the superintendent believes that an

investigation is warranted, he or she may initiate an in-house

investigation, or instead, request investigation by the inspector general's

---

[17]     Before utilizing this procedure, an inmate generally should first report any incident to an employee's supervisor.  7 N.Y.C.R.R. § 701.8(a).

[18]     The regulations pertaining to the grievance process describe harassment as any allegation involving "[e]mployee misconduct met to annoy, intimidate, or harm an inmate . . ."  7 N.Y.C.R.R. § 701.2(e); *see also* DOCS Directive No. 4040.

office.  7 N.Y.C.R.R. § 701.8(d).  Once the grievance is determined, a matter which must occur within twenty-five business days of filing, *see* 7 N.Y.C.R.R. § 701.8(f), the inmate may appeal to the CORC, a step which is required in order to satisfy the exhaustion requirement.  *See Singh v. Goord*, 520 F. Supp. 2d 487, 495 (S.D.N.Y. 2007) (indicating that appeal to the CORC is required to exhaust a prisoner's administrative remedies in New York State); *Sulton v. Greiner*, No. 00 Civ. 0727, 2000 WL 1809284, at *4 (S.D.N.Y. Dec. 11, 2000) (granting summary judgment for failure to exhaust administrative remedies where prisoner neglected to appeal to the CORC).

In this instance the record discloses that plaintiff did not follow either of these procedures with regard to his claims of retaliation, instead by-passing the grievance process altogether by allegedly writing letters to the facility superintendent.  It is well-established that such communications, however, are insufficient to satisfy the PLRA's exhaustion requirement. *See, e.g., Houze v. Segarra,* 217 F. Supp. 2d 394, 397 (S.D.N.Y. 2002).

Despite an inmate's entitlement under most circumstances to file and pursue a grievance in accordance with the IGP, there are circumstances under which the grievance procedure nonetheless is

28

deemed not to have been available to an inmate plaintiff.  *See Hemphill*, 380 F.3d at 687-88.  Thus, for example, "[e]xhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, . . . or where defendants' behavior prevents plaintiff from seeking administrative remedies."  *Hargrove,* 2007 WL 389003, at *8 (citations omitted) (noting, for example, that a defendant's failure to advance plaintiff's grievances or the issuance of threats against an inmate to deter the filing of a grievance may effectively render the administrative process unavailable).  When testing the availability of administrative remedies in the face of claims that undue influence from prison workers has caused a plaintiff inmate to forego the formal grievance process, courts employ an objective test, examining whether "a similarly situated individual of ordinary firmness [would] have deemed them available."  *Id.* at 688 (internal quotations and citations omitted); *see Hargrove,* 2007 WL 389003, at *8.

From a review of the record before the court it appears that the claims now being raised by the plaintiff constitute grievable controversies as defined under the IGP.  Plaintiff has asserted no basis to conclude that he misunderstood the grievance process or that through their actions the

defendants improperly deterred his filing of a grievance, and the record

discloses no basis for such a finding.[19]   Accordingly, I conclude that there

was an administrative remedy available to the plaintiff in this case at the

times relative to his claims.

2.      Presentation of Defense/Estoppel

_____The second prong of the *Hemphill* analysis focuses upon "whether

the defendants may have forfeited the affirmative defense of non-

exhaustion by failing to raise or preserve it, or whether the defendants'

own actions inhibiting the inmate's exhaustion of remedies may estop one

or more of the defendants from raising the plaintiff's failure to exhaust as a

defense."  *Hemphill,* 380 F.3d at 686 (citations omitted).

In their answer, defendants have asserted failure to exhaust as an

affirmative defense.  *See* Answer (Dkt. No. 41) ¶ 14.  Since the record

does not disclose any circumstances which would warrant a finding that

defendants have relinquished the affirmative defense of non-exhaustion, I

_____

[19]      The court is somewhat hampered in its ability to determine whether a
basis exists to excuse the requirement of exhaustion in this case, in light of plaintiff's
failure to respond to defendants' motion.  The record is lacking, however, in any
evidence suggesting that the defendants or other prison officials prevented Applegate
from pursuing available administrative remedies.  Brown Aff. (Dkt. No. 52-4) Exh.  A at
43-44; *see also* Defendants' Local Rule 7.1(a)(3) Statement ¶ 83.

find no basis to conclude that the defendants have forfeited their right to assert an exhaustion defense.

### 3.   Special Circumstances

The third, catchall factor to be considered under the Second Circuit's prescribed exhaustion rubric focuses upon whether special circumstances have been plausibly alleged which, if demonstrated, would justify excusing a plaintiff's failure to exhaust administrative remedies. *Hemphill,* 380 F.3d at 689; *see also Giano v. Goord,* 380 F.3d 670, 676-77 (2d Cir. 2004); *Hargrove,* 2007 WL 389003, at *10. Among the circumstances potentially qualifying as "special" under this prong of the test include where a plaintiff's reasonable interpretation of applicable regulations regarding the grievance process differs from that of prison officials and leads him or her to conclude that the dispute is not grievable. *Giano*, 380 F.3d at 676-77; *see also Hargrove,* 2007 WL 389003, at *10 (quoting and citing *Giano*). In this instance plaintiff does not allege, nor does the record disclose, any special circumstances which would justify excusing the plaintiff from the PLRA exhaustion requirement.

In sum, the record supports a finding, as defendants now assert, that with the exception of his court access claims, plaintiff has forfeited his

right to pursue the remaining cause of action in his complaint by failing to satisfy the exhaustion requirement before filing this action.  I therefore recommend that the portion of defendants' motion seeking dismissal of plaintiff's claims, with the exception of the court access claim, be granted on this procedural basis.

      D.    <u>Sufficiency Of Plaintiff's Excessive Force Claim</u>

The centerpiece of plaintiff's complaint in this action is his claim against defendant Carlson, alleging that during the course of conducting a security pat-frisk he exerted excessive force toward him, thus violating his rights under the Eighth Amendment.  In their motion, defendants contend that even if this claim were not subject to dismissal for failure to exhaust, they would nonetheless be entitled to summary judgment dismissing the claim as a matter of law because no reasonable factfinder could conclude that the incident arose to a level of constitutional significance.

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley v. Albers,* 475 U.S. 312, 319, 106 S. Ct. 1076, 1084 (1986) (citations and quotations omitted); *Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir. 1999). The lynchpin inquiry in deciding claims of excessive force against prison

officials is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."  *Hudson v. McMillian,* 503 U.S. 1, 6-7, 112 S. Ct. 995, 998 (1992) (applying *Whitley* to all excessive force claims); *Whitley*, 475 U.S. at 320-21, 106 S. Ct. at 1085 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.) (Friendly, J.), *cert. denied sub nom.*, *John v. Johnson*, 414 U.S. 1033, 94 S. Ct. 462 (1973)).

Eighth Amendment analysis requires both objective and subjective examinations.  *Hudson,* 503 U.S. at 8, 112 S. Ct. at 999; *Wilson v. Seiter*, 501 U.S. 294, 298-99, 111 S. Ct. 2321, 2324 (1991); *Griffen*, 193 F.3d at 91.  The objective prong of the inquiry is contextual, and relies upon "contemporary standards of decency."  *Hudson*, 503 U.S. at 8 (quoting *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S. Ct. 285, 290 (1976)).  When addressing this component of an excessive force claim under the Eighth Amendment calculus, the court can consider the extent of the injury suffered by the inmate plaintiff.  While the absence of significant injury is certainly relevant, it is not dispositive, as the defendants seemingly suggest.  *Hudson*, 503 U.S. at 7, 112 S. Ct. at 999.  The extent of an inmate's injury is but one of the factors to be considered in determining a

prison official's use of force was "unnecessary and wanton"; courts should also consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Whitley*, 475 U.S. at 321, 106 S. Ct. at 1085 (citing *Johnson*, 481 F.2d at 1033).  Under *Hudson*, even if the injuries suffered by a plaintiff "'were not permanent or severe'", a plaintiff may still recover if "'the force used was unreasonable and excessive.'"  *Corselli v. Coughlin*, 842 F.2d 23, 26 (2d Cir. 1988) (quoting *Robinson v. Via*, 821 F.2d 913, 924 (2d Cir.1987)).

In his complaint plaintiff alleges that he was "grabbed . . . by the back of his shirt" by Carlson, who "attempted to slam his face into the wall."  Complaint (Dkt. No. 1) ¶ 37.  Plaintiff also alleges that defendant Carlson continued "to attempt to smash [his] face into the wall[.]"[20] *Id.* ¶ 38.  Plaintiff does not allege, however, that he was required to seek medical treatment, or for that matter that he suffered any significant injury as a result of defendant Carlson's actions, and in fact acknowledged during his deposition that he was not injured as a result of the incident.

---

[20]     During his deposition, plaintiff recounted a slightly different version of the incident, noting that Officer Carslon "slammed [him] in the back and tried to . . . slam [his] face against the wall. . . ."  Brown Aff. (Dkt. No. 52-4) Exh. A at 49.

Brown Aff. (Dkt. No. 52-4) Exh. A at 55.

In his affidavit Officer Carlson notes that the incident occurred during a routine pat-frisk of all inmates, accomplished for security reasons. Carlson Decl. (Dkt. No. 52-13) ¶¶ 4-13. Officer Carlson also asserts that the use of force was necessitated by plaintiff's removal of his hand from the walls during the pat-frisk despite instructions that he keep his hands "high and flat on the wall" . . . and not "take them down until [he was] told to do so." *Id.* ¶ 14. Defendant denies attempting to push the plaintiff's face into the wall and any intent to cause bodily harm, instead stating that he simply took measures calculated to respond to what he believed was a threat of resistence by the inmate. *Id.* ¶¶ 22-23. Under these circumstances, from an objective point of view, I am unable to find that plaintiff's excessive force claim arises to a level of constitutional significance. *See Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir. 1997) (the fact that the plaintiff, who claims he was "bumped, grabbed, elbowed, and pushed" by the defendants did not rise to a level of constitutional significance since plaintiff did "not maintain that he experienced any pain or injury as a result of the physical contact"); *Cunningham v. Rodriguez,* No. 01 Civ. 1123, 2002 WL 31654960, at *5 (S.D.N.Y. Nov. 22, 2002).

Accordingly I recommend a finding that objectively, plaintiff's excessive force claim is legally insufficient.

Turning to the subjective element, as defendants argue, to prevail plaintiff must establish that defendant acted with a sufficiently culpable state of mind. *Davidson v. Flynn*, 32 F.3d 27, 30 (2d Cir. 1994) (citing *Hudson*, 503 U.S. at 8, 112 S. Ct. at 999). That determination is informed by four factors, including 1) the need for application of force; 2) the relationship between that need and the amount of force used; 3) the threat reasonably perceived by the responsible officials; and 4) any efforts made to temper the severity of a forceful response. *Whitley*, 475 U.S. at 321, 106 S. Ct. at 1085. The principal focus of this inquiry "turns on 'whether force was applied in a good faith effort to maintain discipline or maliciously and sadistically for the very purpose of causing harm.'" *Whitley*, 475 U.S. at 320-21, 106 S. Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d at 1033. When considering the subjective element of the governing Eighth Amendment test, a court must consider that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness since, as the Supreme Court has noted,

> [w]hen prison officials maliciously and sadistically
> use force to cause harm, contemporary standards

> of decency always are violated. . . . This is true
> whether or not significant injury is evident.
> Otherwise, the Eighth Amendment would permit
> any physical punishment, no matter how diabolic or
> inhuman, inflicting less than some arbitrary quantity of injury.

*Hudson*, 503 U.S. at 9, 112 S. Ct. at 1000 (citations omitted); *Velasquez*

*v. O'Keefe*, 899 F. Supp. 972, 973 (N.D.N.Y. 1995) (McAvoy, C.J.)

(quoting *Hudson*, 503 U.S. at 9, 112 S. Ct. at 1000); *see Romaine v.*

*Rewson,* 140 F. Supp. 2d 204, 211 (N.D.N.Y. 2001) (Kahn, J.).  Even a *de*

*minimis* use of physical force can constitute cruel and unusual punishment

if it is "repugnant to the conscience of mankind."[21]  *Hudson*, 503 U.S. at 9-

10, 112 S. Ct. 1000 (citations omitted).

Analyzing the subjective element, utilizing this test as a backdrop, I

conclude that the record does not support a finding of requisite subjective

intent.  Accordingly, having found that when presented with the evidence

now before the court no reasonable factfinder could conclude that plaintiff

has met either the objective or the subject component of the controlling

---

[21]  It should be noted, however, that in practice a truly *de minimis* use of force will rarely suffice to state a constitutional claim.  *Hudson,* 503 U.S. at 9-10, 112 S. Ct. at 1000 ("[Not] every malevolent touch by a prison guard gives rise to a federal cause of action"); *Griffen*, 193 F.3d at 91 (citing *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993)); *Johnson*, 481 F.2d at 1033 ("Not every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights").

test, I recommend the entry of summary judgment dismissing his excessive force claim in its entirety.

      E.     <u>Sufficiency Of Plaintiff's Retaliation Claim</u>

Another primary focus of plaintiff's complaint in this action is his retaliation claim.  Plaintiff contends that in retaliation for his having brought and prosecuted the claims raised in *Applegate I*, prison officials at Greenhaven engaged in retaliatory conduct against him.  Plaintiff also alleges that after writing to Greenhaven Superintendent C. Artuz regarding harassment on February 21, 1999, he was the subject of further pat-frisks and the use of excessive force by Corrections Officer Carlson on March 4, 1999.  Defendants also seek dismissal of this cause of action, asserting that it is stated in purely conclusory terms and that the record is lacking in evidence to establish the requisite connection between the various actions taken against plaintiff and the events which allegedly precipitated them.

In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) he or she engaged in protected activity; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action –

in other words, that the protected conduct was a "substantial or motivating

factor" in the prison officials' decision to take action against the plaintiff.

*Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287,

97 S. Ct. 568, 576 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir.

2007); *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001), *overruled on*

*other grounds*, *Phelps v. Kapnolas*, 308 F.3d 180 (2d Cir. 2002).  If the

plaintiff succeeds in meeting this burden, then the defendants must show

by a preponderance of the evidence that they would have taken action

against the plaintiff "even in the absence of the protected conduct" in

order to avoid liability, *Mount Healthy*, 429 U.S. at 287, 97 S. Ct. at 576.

Put another way, if taken for both proper and improper reasons, state

action may be upheld if the action would have been taken based on the

proper reasons alone.  *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir.

1996) (citations omitted).

     The theory articulated by the plaintiff in support of his retaliation

claim is that defendant Annucci, a Deputy Commissioner and the General

Counsel for the DOCS, directed that DOCS employees at Greenhaven

retaliate against him in light of having filed suit in *Applegate I*.[22]  In support

---

     [22]     Plaintiff also seemingly alleges that a Tier II misbehavior report, received
shortly following the 1999 incident, was issued in retaliation for his having

of their motion defendants have submitted an affirmation from Deputy Commissioner Annucci in which he points out that in his capacity as General Counsel he has overarching responsibility for the provision of legal services necessary to operate the DOCS, with its 31,600 employees and 63,800 inmates.  Annucci Aff. (Dkt. No. 52-12) ¶ 2.  Defendant Annucci further notes that his involvement in inmate litigation, which is typically defended by the office of the New York State Attorney General, is extremely limited and ordinarily would only involve class actions or issues implicating overall departmental policies.  *Id.* ¶¶ 4-7.  Defendant Annucci also notes that at any given time there are thousands of lawsuits pending against the DOCS or its employees.  *Id.* ¶ 7.  Defendant Annucci states that to his recollection he had no contact with the attorneys representing the defendants in *Applegate I,* and denies having ordered anyone to retaliate against the plaintiff, including to initiate a weapons possession charge at Elmira.  *Id.* ¶¶ 10, 16-17.

Now that the matter has progressed to the summary judgment

---

"immediately" written to the DOCS Inspector General's Office on that same date complaining of the matter.  Complaint (Dkt. No. 1) ¶¶ 39-40.  There is no evidence in the record, however, to link the two, or to indicate defendant Carlson's awareness of the writing of that letter, or to otherwise suggest that the misbehavior report was issued solely in retaliation for that letter.

stage, it is no longer sufficient for the plaintiff to engage in mere conjecture; instead, in response to the defendants' motion it was incumbent upon Applegate to come forward with evidence from which a reasonable factfinder could find the requisite nexus between his pursuit of claims in *Applegate I* – unquestionably activity which is constitutionally protected – and the adverse actions taken against him.  *See Mount Healthy*, 429 U.S. at 287, 97 S. Ct. at 576.  It should be noted that none of the defendants in this action were defendants in *Applegate I,* and that matter appears to have implicated actions taken by DOCS employees at prisons other than those involved in this case, including the Shawangunk Correctional Facility, the Woodburn Correctional Facility, the Downstate Correctional Facility, the Southport Correctional Facility, and the Clinton Correctional Facility.  Simply stated, the record discloses no basis to conclude that the defendants in this action had knowledge of the *Applegate I* suit, nor any basis upon which a factfinder could conclude that the pursuit of plaintiff's claim in *Applegate I* led to retaliatory animus on the part of the defendants named in this action.

As can be seen, evaluation of claims of retaliation is a particularly fact-laden exercise, since such claims revolve around the engaging in

protected conduct, and require establishment of a nexus between that conduct and the adverse action ultimately taken.  Because plaintiff's retaliation claims have been alleged in only conclusory form, and are not supported by evidence now in the record establishing a nexus between any protected activity and the adverse actions complained of, I recommend that defendants' motion for summary judgment dismissing plaintiff's retaliation claims be granted.  *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983).

     F.    <u>Sufficiency of Plaintiff's Court Access Claim</u>[23]

The portion of plaintiff's court access claim which remains intact, following the earlier decision regarding defendants' dismissal motion, concerns his alleged inability to conduct proper research in order to pursue a request for leave to appeal from an apparent denial of a N.Y. Criminal Procedure Law § 440.10 motion collaterally challenging his underlying murder conviction.  Complaint (Dkt. No. 1) ¶¶ 57-68. Defendants assert that this claim, though properly exhausted, is legally

---

[23]     In the court's prior orders, all of plaintiff's court access claim, with the exception of the portion related to the challenge of his state court conviction, was dismissed based upon lack of prejudice.  *See* Report and Recommendation, dated 9/21/05 (Dkt. No. 38) at pp. 21-24; Decision and Order, dated 2/2/06 (Dkt. No. 40).

deficient because plaintiff cannot establish a right of court access

protected by the Constitution.

Without question, an inmate's constitutional right to "meaningful"

access to the courts is firmly established.  *Bounds v. Smith*, 430 U.S. 817,

823, 97 S. Ct. 1491, 1495 (1977) (citations and internal quotation marks

omitted).  Although in *Bounds* the Supreme Court held that this right of

access requires prison authorities "to assist inmates in the preparation

and filing of meaningful legal papers by providing prisoners with adequate

law libraries or adequate assistance from persons trained in the law[,]" *id.*

at 828, 97 S. Ct. at 1498, the Court later clarified that

> prison law libraries and legal assistance programs are not
> ends in themselves, but only the means for ensuring a
> reasonably adequate opportunity to present claimed violations
> of fundamental constitutional rights to the courts.  Because
> *Bounds* did not create an abstract, freestanding right to a law
> library or legal assistance, an inmate cannot establish relevant
> actual injury simply by establishing that his prison's law library
> or legal assistance program is subpar in some theoretical
> sense.

*Lewis v. Casey*, 518 U.S. 343, 351, 116 S. Ct. 2174, 2180 (1996) (internal

quotations and citations omitted).  Instead, to prevail on such a claim an

inmate "must go one step further and demonstrate that the alleged

shortcomings in the library or legal assistance program hindered his

efforts to pursue a legal claim."  *Id.*  In other words, to establish a violation

of the right of access to the courts, a plaintiff must demonstrate that

defendants' interference caused him or her actual injury – that is, that a

"nonfrivolous legal claim had been frustrated or was being impeded" as a

result of defendants' conduct.  *Id.* at 353, 116 S. Ct. at 2181.

Plaintiff's court access claims surround the alleged inadequacy of

law library facilities at Upstate.  *See* Complaint (Dkt. No. 1) ¶¶ 58-60; *see*

*also* Brown Aff. (Dkt. No. 52-4) Exh. A at 21-23.  Plaintiff asserts that

because it was a new facility at the time of his transfer there, Upstate did

not then contain a fully stocked law library.[24]  *Id.*  Accordingly, while

acknowledging that he had adequate opportunity to perform legal

research at Greenhaven in connection with his initial motion under N.Y.

Criminal Procedure Law § 440.10, *see* Brown Aff. (Dkt. No. 52-4) Exh. A

at 28, plaintiff apparently contends that he was deprived of sufficient

materials to support his request for leave to appeal from the unfavorable

---

[24]     According to the plaintiff, beginning in or about October of 1999 a CD
ROM computer system was installed at Upstate for the purpose of permitting inmates
to perform legal research.  Brown Aff. (Dkt. No. 52-4) Exh. A at 32.  That was followed
by the acquisition of books and legal manuals, beginning the following month.  *Id.* at
32-33.  Plaintiff's challenge to the inadequacy of the legal facilities at Upstate in this
action is apparently limited to during the first four months that the prison was open.  *Id.*
at 33.

determination of that application.

There are two fatal deficiencies in plaintiff's library access claim. First, neither plaintiff's complaint nor his deposition reveal the existence of any injury suffered as a result of the alleged library shortcomings.  After the failure of his section 440.10 motion, which he was fully able to research and file, plaintiff was apparently able to file a request for leave to appeal, having been provided with the requisite paper and writing instruments to do so.  Plaintiff apparently surmises that had he been able to conduct proper research, his request for permission to appeal might have been granted; such rank speculation, without more, is insufficient to establish the specific prejudice necessary to support a constitutional claim.  *See, e.g.*, *Konigsberg v. LeFevre*, 267 F. Supp. 2d 255, 261-62 (N.D.N.Y. 2003) (Munson, S.J.) (rejecting plaintiff's access to the courts claim where he asserts in purely speculative and conclusory terms that his inability to access certain legal files "perhaps" may have caused him to lose his subsequent new trial).

There is another, equally compelling reason for dismissing plaintiff's court access claims.  Aside from Corrections Officer Gardner, who was never served and who plaintiff agrees was a mere "pawn" and could not

45

have changed the system at Upstate, there is no one among the named

defendants in this case who, plaintiff has demonstrated, had personal

involvement in the failure to provide law library facilities.  Since personal

involvement in a constitutional deprivation is a prerequisite to finding

liability, *see Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt*

*v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991) and *McKinnon v.*

*Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087,

98 S. Ct. 1282 (1978)), plaintiff's failure to name any defendant personally

involved in that deprivation warrants dismissal of the court access claim.

> G.    Personal Involvement Of Superintendent Bennett

Among the defendants named in plaintiff's complaint is F. G.

Bennett, the Superintendent at Elmira during the relevant period.

Plaintiff's claims stemming from events at Elmira relate to the loss of

property, a claim which was previously dismissed, as well as the alleged

planting of a weapon in his cell.  Defendants assert that this is an

insufficient basis to hold defendant F.G. Bennett personally accountable

for the constitutional claims set forth in plaintiff's complaint.

Personal involvement of defendants in alleged constitutional

deprivations is a prerequisite to an award of damages under section 1983.

46

*Wright,* 21 F.3d at 501 (citing *Moffitt,* 950 F.2d at 885 (2d Cir. 1991) and

*McKinnon,* 568 F.2d at 934 (2d Cir. 1977)).  In order to prevail on a

section 1983 cause of action against an individual, a plaintiff must show

some tangible connection between the constitutional violation alleged and

that particular defendant.  *See Bass v. Jackson*, 790 F.2d 260, 263 (2d

Cir. 1986).

     A supervisor like Superintendent Bennett cannot be liable for

damages under section 1983 solely by virtue of being a supervisor – there

is no *respondeat superior* liability under section 1983.  *Richardson v.*

*Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501.  A

supervisory official can, however, be liable in one of several ways: 1) the

supervisor may have directly participated in the challenged conduct; 2) the

supervisor, after learning of the violation through a report or appeal, may

have failed to remedy the wrong; 3) the supervisor may have created or

allowed to continue a policy or custom under which unconstitutional

practices occurred; 4) the supervisor may have been grossly negligent in

managing the subordinates who caused the unlawful event; or 5) the

supervisor may have failed to act on information indicating that

unconstitutional acts were occurring.  *Iqbal v. Hasty*, 490 F.3d 143, 152-

53 (2d Cir. 2007); *see also Richardson*, 347 F.3d at 435; *Wright*, 21 F.3d at 501; *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986).

The record discloses no basis to find personal involvement, or indeed any awareness, on the part of defendant Bennett in connection with plaintiff's weapons planting allegation.  While plaintiff does allege that defendant Bennett was aware of the stolen properly claim by virtue of his letter to the superintendent complaining of that incident, the mere writing of the letter to a superintendent, without response, is an insufficient basis to find personal involvement on the part of the Superintendent.[25] *Greenwaldt v. Coughlin*, No. 93 Civ. 6551, 1995 WL 232736, at *4 (S.D.N.Y. Apr.19, 1995) ("[I]t is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations.") (citing, *inter alia, Garrido v. Coughlin*, 716 F.Supp. 98, 100 (S.D.N.Y.1989) (dismissing claim against superintendent of prison where only allegation was that he ignored inmate's request for an investigation)).

---

[25]     In any event, plaintiff's lost property claim has already been dismissed by the court.

48

In sum, based upon the lack of any showing of personal involvement on the part of defendant Bennett in the constitutional violations alleged, I recommend his dismissal from the action on this independent basis.

IV.    SUMMARY AND RECOMMENDATION

Because plaintiff failed to file and pursue to completion a grievance regarding any of the claims asserted in his complaint, with the exception of the court access claim, the pursuit of those claims in this action is procedurally barred as a result of Applegate's failure to satisfy the PLRA's exhaustion requirement before filing suit.  Turning to the merits of the claims advanced by the plaintiff, who has chosen not to file any response to defendants' summary judgment motion, I find that the record lacks any evidence from which a reasonable factfinder could conclude that excessive force was used by defendant Carlson against him during the course of a security-related pat-frisk, or that any of the defendants retaliated against him based upon, *inter alia*, his commencement of and pursuit of claims in *Applegate I*.  Plaintiff''s complaint is also deficient insofar as it alleges the denial of court access, based both upon the lack of any showing of involvement on the part of the defendants in the failure to provide adequate library facilities at Upstate over a brief period of time

49

following its opening, and further based upon the fact that plaintiff has not

established the existence of any injury or prejudice resulting from that

alleged failure.  Finally, I find that by virtue of plaintiff's failure to serve

him, defendant Gardner is entitled to dismissal of plaintiff's claims against

him, without prejudice, and further find that defendant Bennett is entitled

to dismissal of all claims against him based upon the lack of any showing

of personal involvement in the constitutional deprivations alleged.[26]

Based upon the foregoing, it is hereby

RECOMMENDED, that defendants' motion for summary judgment

(Dkt. No. 52) be GRANTED, and that plaintiff's complaint be DISMISSED

in its entirety, without prejudice against defendant C.O. Gardner, but

otherwise with prejudice.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge

written objections to the foregoing report.  Such objections shall be filed

with the Clerk of the Court within TEN days.  FAILURE TO SO OBJECT

TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C.

§ 636(b)(1); Fed. R. Civ. P.  6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85

---

[26]     In light of my findings with respect to merits of plaintiff's claims I find it unnecessary to address plaintiff's additional argument of entitled to qualified immunity. *See Saucier v. Katz,* 533 U.S. 194, 121 S. Ct. 2151 (2001).

(2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

Dated:      May 30, 2008
            Syracuse, NY

David E. Peebles
U.S. Magistrate Judge